Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States in this honorable court. Good afternoon and welcome to the 11th Circuit. Today we have before us the case of Davis v. the Commissioner of the Alabama Department of Corrections, case number 18-14671. I know you are both familiar with our timing system, but just as a quick reminder, when you have time left, it will be in green. When your time is running short, it will turn to yellow. When it turns to red, your time is up. We ask that you please comply with the time restriction. Of course, if one of us asks you a question and that takes you over the limit or asks it to you after the limit, please do go ahead and answer the question. We are asking it because we want to hear your answer. We will get started. We will hear first from Mr. Matthews. May it please the court, Mike Matthews of Foley and Lardner for the appellant petitioner, Jimmy Davis, Jr. In addition to being sexually abused as a two-year-old, Jimmy Davis was repeatedly beaten by his mother with a belt buckle and a switch and an extension cord and a broomstick, giving him a severed ear, a warped head, and 25 to 35 oozing bloody lashes on his back. The state of Alabama Department of Human Resources social worker said it was the worst back she had ever seen in all her years of handling child abuse cases. The social worker who documented the abuse said Jimmy should have been removed from the home, but he wasn't. The state failed Jimmy Davis. The state failed Jimmy Davis again when the jury in this case heard none of that due to the ineffective trial counsel that the state provided, who did almost no mitigation preparation in the eight months between appointment until one week before trial, one brief conversation with Davis's mother, and 0.9 hours talking to a school psychometrist about IQ. That was the sum total of the mitigation preparation before trial, and it showed at the trial the deficiencies were not limited to the child abuse issues. Davis's own trial counsel said in closing argument, I know Davis just had a felony robbery conviction, and now he's back with another case, and quote, that sounds bad. That sounds real bad, and then he sat down. That was it. That's at the trial transcript at 1349, even though a cursory review of the pizza robbery case file would have shown that it was in fact Bashan Sigler who was the unidentified Black male saying give it up to the pizza delivery man with his hand in his pocket, not Jimmy Davis. That's it. In this case, you've got to show that the counsel should have been aware of the abuse, and if Davis isn't disclosing it and his mother isn't disclosing it, what should counsel have done? He wasn't put on notice, unlike some of these other cases that you're citing where you cite to Maples, Johnson, Williams, and Wiggins, and there the deficiency determinations were driven in large part by the fact that at the time of trial, counsel was aware of significant potentially mitigating information but still failed to investigate. Why was Davis's counsel on notice such that they should have investigated? The problem here is that the second ACCA court, when it reversed course from its prior opinion finding that resentencing was compelled, it rested its decision based on a falsehood that finds no support anywhere in the record, and the record completely contradicts the finding, which is that Jimmy Davis and his family actively and intentionally misled and manipulated trial counsel. The federal habeas court compounded that error by ascribing intent to the Davis family about alleged lies that never happened. The district court rejected the application of the Daniel case for one reason, saying Davis and his family intentionally thwarted counsel's attempts to uncover helpful mitigation evidence, but there was no such attempt by counsel, much less thwarted by Davis or his family, much less intentionally. The fact is, counsel spent almost no time investigating, and the uncontroverted evidence shows that trial counsel never asked the question of anyone about child abuse or sexual abuse or even about Jimmy's childhood because his understanding of this counsel. Davis's trial counsel said he's never offered child abuse in any case. He said there was no reason to ask Jimmy Davis or his mother about any kind of abuse. He said he would only offer child abuse evidence, quote, if it was somehow related to the crime, and that's at page 76 of the Rule 32 proceedings. This wasn't a child abuse offense, so counsel never looked for anything about his childhood. Are you saying that an attorney is constitutionally deficient representation that attorney does not ask specifically, were you abused as a child? The counsel at least has to ask about childhood or about some deprivation in childhood or about any challenges that he faced in childhood. Here we have none of that. So before trial, his counsel only met with him for two hours and they testified, his counsel testified, that when we spoke to him, both of the counsel, uh, the only thing we talked about was guilt or innocence. All he said was, I didn't do it, go talk to this alibi witness. His counsel said that's all we talked about. So Davis was never asked anything about himself. His mother was never asked anything about Jimmy's life or any challenges that he faced either. So the state makes much of this alleged contact that, uh, again is a total error in the his sisters. So that is a mistake either by the expert or by the Davis or by the court, because we know no one contacted his sisters as they testified under oath at the rule 32 hearing. But I know you've challenged that, uh, finding by the state court. Um, but a determination of a factual issue made by a state court shall be presumed to be correct. And the prisoner would burden of rebutting the presumption of correctness by clear and convincing evidence. How have you met that burden? Yes, we have that. So we have Adam's notes of the one mitigation interview that he and Giddens did that's at exhibit 10. It shows the questions and the answers that were asked shows he asked about school and drinking and drugs. And, uh, and that was about it. Uh, we also, the notes also show that counsel only asked for Jimmy Davis's make sure that we're on the same page. What you're saying is incorrect. The state court at the rule 32 hearing, um, found that, um, that, uh, Davis had admitted that his lawyer spoke to two sisters and you're saying that's false. How do you meet that burden of showing that that was incorrect by clear and convincing evidence? Right. So we know it from the notes of the interview. We know it from the fact that they didn't write down the sister's phone numbers. We know it from counsel's testimony that they never spoke to the sisters. We know it from the sister's testimony that no one ever contacted them. You didn't call the second council. How can, how can you meet that burden without having called that council without having introduced any statement from that council into the record? So this, this is absolutely critical. Um, and I want to emphasize this, the state stipulated to what Adam's testimony would be. And this is why we wrote this letter to the court on Monday, pointing out the stipulation. The state stipulated that anything of substance that Adams did in this case was described in his time entries as his testimony would be cumulative of getting his testimony. The state, it was actually the state's idea. So the state proposed to us 20 years ago at the rule 32 hearing, uh, why don't we save some time? You call up Adams on the phone, just ask him if he did anything that's not mentioned in his time entries. The state then stipulated to that on the record, that's at pages 612 and 613 of the rule 32 transcript. We know exactly what John Adams did here from his time entries, from his notes, from witness testimony, the sisters and everyone else who was not contacted. And it was precious little. Now, uh, the other reason we know, uh, what Adams did and didn't do besides the stipulation is the, um, Giddens, uh, counsel, uh, he testified at trial that quote, we did all of these things. So once under the DeBruce case, once a counsel testifies, what we did, then there's no requirement to call the other counsel. Uh, that's a page 1272 of the DeBruce case. Now the second court, uh, tried to turn that into a representation that Davis and his family misled counsel, but there's not a shred of evidence anywhere in the case. All of the clear and convincing evidence is completely to the contrary. It is based on an error. This death sentence is based on an error and it's a grievous error. When Davis was finally asked at the time of the rule 32 proceedings, what tell me about discipline? The state's expert asked him, he said straight up, my mom hit me with a switch. One question, the very first question that was asked of Davis, he told the expert I was hit with a switch. He didn't hide it. He didn't lie about it. So if trial counsel had only asked this one question or anything close to it around the time that they had done any mitigation preparation, other than a brief meeting with the mother and 0.9 hours talking to a school psychometrist, they would have come across this. Now it's the case law on this is completely to, again, to the contrary of arguing that you can simply say, well, that the family and Davis didn't volunteer it to us. Strickland says counsel can only stop investigating when a defendant has affirmatively given counsel reason to believe further investigation would be either fruitless or harmful. That's the standard, not did the defendant fail to volunteer it. Did any of the family members that ultimately testified to the abuse, did any of the family bring up that abuse during the first interview or was it always during a second or later interview? The family, the sisters brought up the abuse right away, but that's of course, because by that time our firm was counsel and we asked the question. So that very quickly led to the DHR records, 345 pages of records, the photographs of Jimmy's back that frankly look like they're out of 1850, not and the case law is, is behind us on this from the Supreme court. So Wiggins versus Smith, the quote from that case is quote, the record contains no evidence that counsel ever pursued this line of questioning with Wiggins end quote, to inquire about child abuse and counsel has to ask the right question. So in Farrell versus Hall, this court held that counsel is deficient for doing a profoundly incomplete investigation, even though they hired an investigator who went out to contact 40 to 45 mitigation witnesses. As this court held in Farrell, the witnesses had no idea what can and can't be presented in mitigation. They only answered the questions they were asked about character and reputation. And this court held that had counsel or the investigator asked any questions beyond character, they would have discovered compelling evidence of the defendant's abuse and impoverished childhood. Now the safe best case is probably Williams versus Head, but even in that case, counsel quote, questioned her, this is the mother, in an attempt to find out any good acts Williams had done or any deprivation he had suffered, end quote. That's at page 1231 of Williams versus Head. So when a counsel fails to investigate because of a mistaken view about what's relevant, deficient performance is all the more clear. And the case most just on point for that is again from the Supreme court, it's Williams versus Taylor. So when mitigation preparation only started one week before trial, counsel and Williams failed to get easily available social services records, not because of any strategic calculation after a reasonable investigation, which didn't happen here either, but because counsel in that case erroneously believed they couldn't get into that. Just as here trial trial counsel erroneously believed you only get into child abuse evidence if it's related to the offense. In addition, the Andrews case, Andrews versus Texas, recent 6-3 decision of the Supreme court decided after the briefing in this case has numerous parallels to this case requiring reversal on the ineffectiveness phase. So Andrews' counsel gave no opening statement in the penalty phase. Davis' trial counsel's opening statement, all he said was keep an open mind. That was it. Andrews' counsel called his mother to testify. There were no difficult circumstances in his childhood when in fact childhood with physically abusive boyfriends, just as in Davis' case. Andrews' counsel did not meet with Andrews' siblings who had disturbing stories about his childhood. And instead they only met with Andrews' parents who offered none of that, same as here. After a brief pre-trial discussion with the mom and an expert on drug use, Andrews' counsel didn't prepare any of the witnesses to testify just as Davis' trial counsel failed to do. They put Andre Figgler on the stand 10 minutes after they met him for the first time in the hallway. Again, simply to beg for mercy, didn't ask him anything about Jimmy Davis' life. And perhaps most importantly from the Andrews' case, Andrews' counsel did not independently investigate the state's aggravating circumstance of a prior assault by a black man. Instead, simply assuming Andrews was the perpetrator, just as Davis' counsel simply said the prior robbery sounds bad, sounds real bad. But had Andrews' counsel looked, he would have discovered that the witness recanted identifying Andrews. It was a different black male. We have the exact same thing here. If anyone had bothered to look at the case file of the pizza robbery, they would see a colloquy with the accomplice who was asked, who was the black male who put his hand in his pocket and said, give it up? He said it was Vashon Figgler. It wasn't even Jimmy Davis. No one knew that because no one bothered to look. Let me ask you a question. You've cited us to Williams v. Taylor, to Wiggins, and in your briefing also the Rompilla decision. How would you address the fact that the Supreme Court told us in Penholster that in Williams v. Taylor and in Rompilla, the court did not apply epidefference to the question of prejudice? And so those cases offer no guidance with respect to whether a state court has unreasonably determined that prejudice is lacking. So this is also critical. So the Rompilla case does apply here because in fact, none of the state courts to address the pizza robbery, which is what we're mainly talking about with Rompilla, none of those courts addressed the prejudice problem at all. So there is no epidefference in this case on the prejudice problem. The only thing that was ever questioned at any time was the ineffectiveness problem. So on prejudice, there simply is no deference because none of the state courts addressed this. What's your best case to tell us that if a lower court, a state court doesn't address a particular issue explicitly that we can't apply deference to that issue? I think that's through all the cases, but probably the Farrell case. I think that's a well-accepted proposition that you go straight to de novo review if the state court has not addressed it. And I want to say something else about Rompilla. So the state tries to distinguish Rompilla on two grounds, which are the same two grounds that the lower courts try to distinguish it on. But this court in Daniel said you cannot distinguish it on those grounds. So the first of the two rounds was that the Second Acre Court said in Rompilla, there's only one aggravating circumstance of a prior conviction. The Federal Habeas Court repeated the same thing. Rompilla only has one aggravating circumstance. This is mind-boggling to me. There were three aggravating circumstances in Rompilla, not one. This is just a simple failure to even read the that's the key case here. The court also held in the Daniel versus Commissioner case that it's unreasonable for a state court to distinguish Rompilla on the basis either that the prior case file did not contain mitigating evidence about crime, same as here, or on the basis that the state did not present the facts of the prior crime to the jury. The exact same two distinguishing factors here that this court in Daniel versus Commissioner said it is unreasonable for a state court to distinguish on those two bases. The court said, quote, that the state may not have presented any evidence about the details of his prior burglary, does nothing to diminish the fact that the actual circumstances were far less aggravating than what the jury heard, end quote. Now there's another important fact. Again, I'm trying to prioritize things that were not in our brief. So in this case on the prejudice problem, one thing that has not been highlighted, I think sufficiently for this court, that again is critical, is even with the completely deficient mitigation preparation, completely deficient mitigation case that was presented to the jury, the jury went out to deliberate on a Friday night, two weeks before Christmas, and it sent a note back out to the judge saying, we are at seven for death, five for life. This was a jury that was at seven to five at 7pm on a Friday night, two weeks before Christmas. The judge said go back and keep deliberating until the jury finally came back with a death sentence of 11 to 1. Even then it still wasn't unanimous. I also wanted to address the Reeves case very briefly. The Supreme Court's recent decision in Dunn versus Reeves, combined with the state's stipulation about Adams' testimony, demolishes the state's argument here that it's on the basis that Adams wasn't called as a witness, that would be reversible error under Reeves. Because the state stipulated he did no substantive work outside of his time entries, and that, and all the other evidence that I've gone through, shows exactly what Adams did and didn't do. Let me ask you about that. You said they stipulated to the validity of the timesheets, but they did not stipulate to the type of mitigation investigation that he did, or whether what he did was the same as Giddens, correct? No, that's not correct. So they did not stipulate simply to the validity of the timesheets. I'll quote the state on this. This is page 613. The state would stipulate that his test, what his testimony would have been in this regard. If he did anything of substance or anything that was significant and took up a lot of time, it was on that timesheet. And the court said, all right, so stipulate it. So to me, it is shocking that the state of Alabama would make the primary argument that this man needs to be put to death because we didn't call him as a witness, when they were the ones who had the idea to stipulate, to save time, to show what John Adams did at trial. He was subpoenaed. We had difficulty getting ahold of him. It was the state's idea to enter the stipulation, not just to the validity of the timesheets, but that the timesheets show what he did. That's how we know that the only 0.9 hours talking to a mental health expert. That's how we know that they only spoke to the mother. They never spoke to any of the sisters. And that's how we know that that was it. There was no other mitigation preparation whatsoever in this case. We're talking about a couple of hours. They didn't even bother asking the client, Jimmy Davis, tell me about your childhood. Tell me about challenges that you had growing up. I'd also like- Before your time ends, related to the prejudice questions, the alleged abuse is certainly horrifying, but I wonder, since there was other evidence in the record, for instance, that I believe Mr. Davis's cousin said that he too was switched for wedding to bed, just not as much. Why should we think that a jury would find this particular level of abuse in that time and place to be so mitigating that it would have made a difference? So first of all, the testimony that you're quoting is from the Rule 32 proceeding. Sigler did not testify to any of that at trial. The jury never heard anything close to that. Oh, no. I know. I'm just saying, why would we think it would make a difference if they had? Right. So there are two bases for the prejudice ruling here, the double-edged sword and remoteness in time. Both of those are contradicted by Supreme Court precedent. So in Wiggins v. Smith, the Supreme Court rejected the double-edged sword precedent as to child abuse. It said it doesn't have a double edge. This court has said the same thing in Maples, in Johnson. It said it again and again. And in terms of remoteness in time, that's also completely contrary to Supreme Court precedent. Every case out there from the Supreme Court, the period of time between the abuse and the offense is much longer than it is here. The that's too remote. Well, in Porter, the defendant was 54 years old. He was 40 or 50 years from the abuse. And yet still, it was found to be prejudicial. The other important point on prejudice is that all of the cases out there on prejudice that go our way, that find prejudice, have far more aggravating crimes. In Wiggins, the defendant was drowned, a 77-year-old woman, in the bathtub after spraying her with roach spray. Williams v. Taylor, the murder was with pickaxe as part of a crime spree, including savagely beating an elderly woman, setting fire to a home, stabbing another man, setting fire to the city jail. In Farrell, the defendant shot his grandmother and his 15-year-old cousin twice in the head at close range execution style. In all of those, the missing piece was the child abuse evidence. And in all of those, the court found prejudice just as it should here. Unless there are further questions, I'll reserve the balance time for rebuttal. Thank you, Mr. Matthews. You've reserved 10 minutes for rebuttal. We will hear from Mr. Wilson. May it please the court. Thomas Wilson on behalf of the state. Throughout his briefing, and in counsel's recent decision, as he just explained, to emphasize things that he never briefed, including his new stipulation theory, which, never having been briefed, is to engage with the state court's fact findings or simply pretend that they don't exist. But most critically, petitioner entirely ignores what the Supreme Court has explained is the only question that matters in federal habeas. Whether it is possible that fair-minded jurists could disagree about whether any theories that did support or could have supported the state court's decision are inconsistent with prior Supreme Court decisions. As the Supreme Court re-articulated in the Strickland context, this means that, quote, a federal court may grant relief only if every fair-minded jurist would agree that every reasonable lawyer would have made a different decision. Applying the proper standard, this is not a closed case. There is no doubt that fair-minded jurists could reject Davis's ineffective assistance claims just as every fair-minded jurist that has analyzed these arguments has already done. I'll address his two claims in turn. Petitioner's first ineffective assistance claim, that counsel were unconstitutionally deficient because they did not discover evidence of childhood abuse, fails for several reasons, beginning with performance. First, fair-minded jurists could find, just as the state court did here, that Davis failed to show that his counsel were ineffective, in large part because he failed to develop a record showing what his counsel actually did or did not do. And this had a lot to do with his failure to call Jonathan Adams, the second attorney who did not play a minor role in the case, to testify. The state court therefore... But counsel, I'm sorry, even if we don't consider the stipulation, which I'm not sure that you're right about that, that we can't consider that, it is a part of the record. And I mean, it seems as though if the state invited the court to do that and sort of lulled Mr. Davis into not presenting that evidence by Mr. Adams, then it really wouldn't be fair for us to do otherwise. But in any case, even without considering it, we do have testimony by Mr. Giddens, excuse me, I'm sorry, in which Mr. Giddens repeatedly says, we did this, we did that. He answers questions by saying, we, referring to himself and to Mr. Adams. In addition, it's asked questions about what he and Mr. Adams did. And so it seems that we could look to that as well to find what Mr. Adams was doing. Why is that not the case? So, Your Honor, that's not the case for a couple of reasons. First, Mr. Giddens, his use of the first person plural pronoun does not mean that he was attempting to provide an exhaustive explanation of what his co-counsel did or didn't do. And at least twice in the Rule 32 hearing, he explained that he did some things by himself, that Mr. Adams did some things by himself, and that they did some things together. In fact, I think page 80, line 14, he even explains that he can't tell you what Adams did when trying to interpret a specific note of Adams's because he just doesn't know. And Your Honor, the state court found that the evidence that Giddens provided was not sufficient to show what Adams did. That was an integral part of the state court's holding. Why aren't the timesheets enough, given that there was no stipulation that those reflected what he did? I don't think that, by the way, is a new argument from your friend on the other side. That seems to be a pretty obvious takeaway from all of the arguments. So, Your Honor, I don't think that timesheets are nearly as persuasive as opposing counsel claims that they are here, in large part because attorneys don't typically record what they did or didn't ask. They don't record the Q&A in a timesheet. Adams may have said that he recorded large chunks of time. I think Giddens also said that he recorded large chunks of time. But opposing counsel's repeated statement that he knows what Giddens and what Adams asked in their question and in their interviews with Davis and with Davis's mother, Lily Bell, there's just no support for that. And the state court also found that there was no support for that. And I'll just remind Your Honor that the state court, the first rule of third district court, was the same court that presided over the initial trial. They found that there just wasn't evidence of what was or wasn't asked, so they expressly found that there was a presumption that Adams asked reasonable questions. I believe that that's on page 533 of the Court of Criminal Appeals' decision. Is there an entry in the timesheet that would indicate that Mr. Adams spoke with any of the sisters? I can't answer that, Your Honor. I'm not sure what exactly would have indicated that, but I would suggest, Your Honor, that both courts, both Rule 32 courts, expressly found that Adams did, in fact, speak with the sisters. That was a finding. Under 2254E1, unless there is clear and convincing evidence that they did not, that Adams did not speak with those sisters, that finding stands. Well, let me ask it to you this way, counsel. And I don't know, in fairness, I haven't looked at the timesheet, so I'm obviously going to have to do that. But just for purposes of this question, assume that there's no entry that says interviewed or spoke with or met with or whatever any one of the sisters. And we also have the other evidence about, you know, from the sisters saying that they never spoke with any counsel for Mr. Davis. Why would that not in and of itself be enough to establish clear and convincing evidence that the state court's finding was erroneous? I'm glad you brought that up, Your Honor. Now, this claim that the sisters denied having spoken with Adams is a little bit of a conflation, because those were two sisters. Davis had three others. And the question is... Yeah, but let me ask you about those three others. At the time that this occurred, the only two sisters who were over the age of 18 were the ones who have said that they did not speak with counsel. The next oldest one at the time would have been 13, and the others, I think, were seven and eight or something like that. So, I mean, doesn't it seem logical that if counsel had spoken with two sisters, counsel would have either spoken with the two sisters who were over 18, or if counsel had spoken with the other three who were not, that the mother would have had to have been present for that meeting? I mean, am I missing something, or have I... I may have misunderstood the record. You can correct me if I did. Well, I think that the math might be a little bit off. I think that they were seven to 10 years, Jimmy Davis was junior. He was 23 at the time. So it would be 13 to 16. To your point about being under 18 and still having the mother there, I think that that's fair, Your Honor. But then that goes back to this question, what should Davis's counsel have known? They did not know that Jimmy Davis's mother was his abuser because, as both state courts repeatedly found, there was a conspiracy of silence to prevent counsel from receiving that information. So there would have been no reason for them to suspect that Jimmy Davis's mother might have been potentially overbearing, simply about her presence with the younger sister, Your Honor. I guess my question is, don't they have the responsibility to check into the issue of whether there was abuse? Would you agree that they do or not? I think that that would be considered standard competency. Yeah. Okay. And so if they had a responsibility to do that and if the mother was the one abusing, I mean, wouldn't it make sense that you would want to ask somebody other than the mother or somebody other than someone who's taken care of by the mother in the mother's presence? Which is why they asked Jimmy Davis, Your Honor. And Jimmy Davis, again, adhered to this conspiracy of silence. The state court repeatedly found that the presumption would have been that Adams asked these questions. There's nothing in the record to suggest that Giddens didn't. And if I may, Your Honor, because opposing counsel brought it up, he says that on page 76 of the Rule 32 transcript, Davis's trial counsel, that's what he uses to support his claim in their brief. On page 35, the Davis's trial counsel did not even attempt to elicit information about his abhorrent childhood from him or anyone else. Now, page 76, lines 11 through 17, those are just a hypothetical. That's a question and answer about a hypothetical about what Giddens would do with abuse information. And he says that he's never used it, but that he would consider using it. And somehow, counsel has construed that into affirmative evidence that Giddens is stating in the record that he never asked the basic question that the state court presumes that both he and Adams would have asked. So if I may continue that. Yes. If he never uses that information. And in fact, I think he testified, again, if I got this wrong, please let me know. But I think he testified that he would use it only if it were related to the crime or the alleged crime, whatever the case may be. And otherwise that it wasn't, it wasn't anything that should be considered. Didn't he say something to that effect? I don't think he did, Your Honor. Would you like me to read the Q&A that opposing counsel sites? No, if your position is that he didn't say that, that's fine. I'm I've got it. I'll go back and I'll double check. But yeah, I want to answer the question. If in fact he did say what I think he said, then I guess the question would be, why would it make sense to presume that he had asked about abuse if he, if he will, if he believed that he couldn't use the information anyway, and that it was not relevant to anything he was doing? Well, Your Honor, not to fight the hypothetical too much, but I don't think he really did say that he didn't think that he would have been able to use that. That's just, that's an unsupported inference that opposing counsel is really lashing onto here. I don't mean to fight the hypothetical, but I just don't think that that's the case. That's okay, counsel. I mean, if what you're saying is correct, then, you know, the record will show that. If it's not, then I have your answer here, which is not going to help me to address that. But if you're right, and the record says what you've said, it won't matter anyway. I think that's right, Your Honor. Thank you. Counsel, can I ask you something about what your opposing counsel said, that we, that because the state court didn't address prejudice, we don't owe any deference. Do you agree that the state court didn't address prejudice? Absolutely not, Your Honor. The state court had a lengthy analysis of prejudice. That's an opposing counsel's complete failure to engage with that thought. I just wanted to make sure your reading of the, what I see is that the court combined the two issues and ruled on prejudice. And I just wanted to make sure I'm reading that correctly. That would accord with my reading as well, Your Honor. So, Your Honor, if I, if I may just continue with performance on Davis's first claim. So, the state court, again, repeatedly found that it did not know what Adams did. And because a silent record is insufficient to overcome the strong presumption of competency, the court couldn't declare that Davis's counsel was incompetent based on that incomplete record. This is completely in line with Strickland, which states that Davis's counsel was incompetent and I'm quoting, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. And that, of course, accords with Burt v. Titlow and Dunn v. Reeves more recently. So, Counselor, is it fair to say that your argument substantially rests on your position that the state court did not, or did not make an unreasonable finding of fact when it determined that counsel had asked Mr. Davis about whether he had been abused? I think our position does rely on the state court's determination that both his counsel would have asked these reasonable questions, Your Honor, and the counsel that wasn't called did act reasonably in accordance with Supreme Court precedent. And now Davis has utterly failed to engage with this finding. Instead, what he argues, again, for the first time in his reply brief, is that this case is like DeBruce, where two members of this court found that testimony from one counsel provided enough information to analyze performance of co-counsel who didn't testify. But that conclusion turned on the findings that counsel engaged in no mitigation effort whatsoever, and also that the absent counsel played only a minor role in the litigation. Here, there's no question that Davis' counsel engaged in mitigation efforts, just as the state courts found, and also as the state court found. And he expressly explained that Adams' role was not minor. That was echoed by Giddens' testimony and is well-supported in the record. Adams took the opening in the sentencing phase. He took the majority of the proceedings. He took the first half of the closing. So that makes... Yes, Your Honor? When we're talking about whether counsel was involved, and we're talking about how involved counsel was, wouldn't you agree there's a difference between being involved in what goes on at trial and what goes on in the investigation? In other words, don't we have to consider how involved, if at all, he was in the investigation as opposed to the trial? And if so, what is the basis for believing that he was deeply involved in the mitigation investigation when the state court explanation seems to rely primarily on what he did during the actual penalty phase? Well, Your Honor, a couple of things. I think what he did during the penalty phase would at least suggest a plausible inference that he might have actually been one in contact with the witnesses that he took, for example, with Lily Bell Davis. I would also note that I don't think it's quite right to say that the state court's analysis really rested on that inference. The state court, again, noted that there was just an empty record. And I'll also note that in Giddens' testimony, the issue of Adams' files came up. And they explained that Adams' files just weren't part of the record. They weren't delivered. Opposing counsel never got them. So we really don't know what Adams did in his investigation, which, again, is why the state court said when there's an empty record, we have to presume that he was competent. Because, again, Your Honor, the burden of proof rests with the petitioner. And it stays there throughout the entire federal habeas argument. I agree with that. Can I take you back for a moment to the other question we were talking about? I just looked at page 76 of the Rule 32 hearing transcript. And the question that was asked was, have you ever offered evidence of physical child abuse? The answer was no. Then the question was, if you found evidence of physical child abuse in the defendant's life, would you offer that in a mitigation stage? The answer was, if it was somehow related to the crime of it. I mean, under non-statutory mitigation, I'm sure it's admissible. I'm sure you can get it in. But I personally did not ever do that. So if it's something that he doesn't ever rely on, unless it's connected to the case, and then he's testified that he's never actually relied on evidence of child abuse, would it have been unreasonable, an unreasonable determination of the fact for the court, the state court to presume that he asked about something he never relies on? Well, Your Honor, I think that the state court would also recognize that Giddens had only had one capital case prior to this. And I think that the fair inference would be in that one capital case, child abuse didn't come up. But as he explains, I'm sure it's admissible as non-statutory mitigation. Non-statutory mitigation was exactly what we're trying to get with their plea for mercy, and he probably would have brought it in. Thank you, Kevin. Thank you, Your Honor. Now, Your Honor, again, I think we discussed this discussion of using the term we, again, Giddens rapidly testified there were things he did that Adams didn't put together, and he declined to speculate about what some of Adams' notes meant, meaning he didn't know and he didn't testify to all of Adams' involvement. Your Honor, fundamentally, because Davis has failed to show what his counsel actually did or did not do, this is the state court repeatedly found, failed to overcome the strong presumption that his counsel behaved reasonably. And on that ground alone, this is ineffective assistance fails. The claim fails for another independent reason. Our minded jurists conclude, just as the state court did here, Davis' failure to bring up his childhood abuse doomed his claim. Now, for decades, the 11th Circuit has made clear, and I'm quoting now, that an attorney does not render effective assistance by failing to discover and develop evidence of childhood abuse that his district court correctly held that the court's binding precedent further forecloses Davis' claim. And this conclusion is really powerful here, where both of the Rule 32 courts repeatedly found that Davis and his family had engaged in a conspiracy of silence and had also affirmatively misled counsel. Again, Davis completely fails to engage with these dispositive facts. Instead, what he does is, in his brief, claims that the contention there was a conspiracy of silence is, quote, congenuous and absurd. Those were the Rule 32 courts' factual findings. State vendors come up with that. Again, Rule 32 court, the circuit court, was the same court that presided over Davis' trial, suggesting that the court would have a much better understanding of the family dynamics than federal habeas counsel might three decades later. In any event, simply game-saying the state court's fact-finding is not an option in federal habeas, no matter how hard the counsel tries to do it. Backing up to the Rule 32 court, didn't the Rule 32 court make some decisions or make some factual statements that were pretty clearly inaccurate, such as whether Davis suffered from brain damage was disputed by the medical experts? The state expert didn't dispute that, right? I apologize, Your Honor. I don't recall the medical dispute off the top of my head. What I saw on the record was that he testified that the IQ and MMPI test performed before trial did not indicate the need for referral to a nurse, I thought, in the first place. Anyway, it seemed to me that there were several areas where the Rule 32 court got things wrong. What's the best evidence that you see in support of this conspiracy and Davis' own involvement in it? I think what the state court relied on, large part, was Davis' continued refusal to really explain what had happened in terms of abuse, even up to the eve of his evidentiary hearing. I think he simply said, you know, his childhood wasn't rosy. Sometimes he was beaten. Sometimes he thought he deserved it. Sometimes he didn't think so. He didn't really get into this until after Rule 32 counsel had spent substantial time with him and these experts were asking him specifically about his abuse. I think that the Rule 32 court also looked at the behavior of his family members and some of the testimony from Andre Siegler at the Rule 32 hearing and reasonably concluded these folks were not comfortable discussing this closely-kept family secret with anybody. I think in Andre Siegler's words, he felt as though he was bringing shame that he was potentially embarrassing his own family by talking about the abuse. But then they eventually, obviously, talked about it, right? Eventually did, Your Honor. Yeah. After several years, and I think as the state court noted, some of these admissions only came weeks before the evidentiary hearing. Do we know who, does the record reflect who first made the allegations of abuse? Which family member brought that news to counsel? I can't represent one way or the other to the court, Your Honor. I'm not sure who made that statement first. Do you know how many of them, if any of them revealed abuse during their first conversation with post-trial counsel? I'm not sure how many. I don't know exactly how many conversations they had, whether they just came out and discussed abuse or not. Okay. I want to give you a chance to get to the prior conviction issue if you want to address that, Mr. Walton. Yeah, I would. I'd also like to briefly touch on prejudice, which very briefly, reasonable jurists could conclude, this is a state court to hear, the murderer was relatively remote in time from the abuse, but abuse wouldn't have been strong mitigation evidence. And I'll note for Your Honor that that was also supported by Jan Vogelsang's own testimony. She stated that there was, quote, a dramatic and extraordinary shift in his behavior, marking a sudden violent streak, and that that shift occurred years after abuse had ceased, years after he moved out of Lily Bell's house. So the jury could therefore have heard about Davis's increased violent streak, and just like this court explained in Dinkin, might have just viewed that as evidence of escalating degeneracy, but might have hurt him just as much as it helped them. And there are other reasons why this could have been a double-edged sword. Most critically, Andre Siegler, Davis's cousin, who he spent substantial time with growing up, that he was beaten almost weekly in a very similar manner to Davis until he was a sophomore in high school. And in fact, he also suffered beatings from Davis's own mother, just like Davis did. To be sure, Your Honor, he testified that his beatings were not as bad as Davis's, but he also testified that he suffered what would be fairly described as similar beating and similar abuse throughout his adolescence. So the jury would have heard that, but also heard that Andre Siegler, despite facing a similar upbringing, joined the Army, defeated the rank of specialist, and did not become a murderer. Which makes this case look a lot like Dinkin's, where testimony from Petitioner's brother, where this court explained that testimony from Petitioner's brother, Michael, might have helped him, but also would have shown that he suffered the same abuse as Petitioner, but instead of going and becoming a murderer, left home, graduated high school, and eventually became a public servant assisting the terminally ill. As this court explained on Bonk in Evans v. Secretary, it is reasonable to conclude that a defendant was not prejudiced, whereas mitigation evidence would have been a better sword. By itself, the double-edged nature of the abuse shows that fair-minded jurists could conclude that Davis was not prejudiced. It's also important to note this case's unique facts present another analytical wrinkle in the prejudice problem. The test for prejudice is whether it's reasonably likely that the proceedings would have resulted in a different outcome had counsel behaved as Petitioner claims that they should have. But here, even if counsel had done exactly what Davis claims they should have done, it's not even reasonably likely that the proceedings would have been different, much less the proceedings outcome. So, for a couple of reasons. First, as the state court explained, there's no guarantee that further investigation would have actually resulted in Davis or his family members discussing the abuse. There was a conspiracy of silence, and any assertion that they would have suddenly complied is exactly what the district court said it was, mere conjecture. Couldn't the attorneys have asked the child services organization if they had any records? Wouldn't that be the ordinary thing that counsel might do? They might, Your Honor. I'd have asked DHR. There's nothing to alert them that we should have asked DHR. I mean, Counselor, isn't that sort of a standard thing that's done in mitigation? You go and you ask for records from any of the social agencies? Not necessarily, Your Honor. I don't think that standard does comb every public agency that might have had involvement with a family. And certainly, in a case like this one, this court's explanation, or this court's repeated holding, the petitioner's failure to even raise the abuse would suggest that we're not constitutionally deficient. We're not going out and targeting DHR specifically. I'd like to also note, even assuming that this counsel had uncovered this evidence, the fact that Lily Bell Davis refused to attend Davis's Rule 32 sentencing hearing suggests that she might not have participated in a trial where her abuse was front and center. But this would have forced Davis's counsel to choose between a mother's case and double-edged sword evidence of abuse. Now, this court's decision in Newland v. Hall is instructive, where it explained that counsel with this new evidence might have actually had to choose a different strategy. As Giddens explained in his Rule 32 testimony, if he were forced to choose between evidence of abuse and a mother's plea for mercy, he would have chosen the latter. He explained that he's seen pleas for mercy work, and especially where it's here the defendant is young. In a conservative county like Calhoun County, that would be the best strategy. If a reasonable jurist could conclude that the discovery of new evidence would not have even altered the proceeding, there's no reason to think it would have altered the outcome. Now, I'll take 30 seconds to try to discuss the prior robbery conviction, or I think the prejudice prime is probably the most important one here. Then, as every court to address this argument has decided, there was just no plethora of mitigating evidence, unlike in Rumpfla, in this conviction. And I think critically, the facts of the conviction suggest that the behavior that Davis took was, and I see that my time is up, Your Honor, if you'll allow me to finish this final thought. Thank you, Your Honor. The jury would have learned with further evidence of the facts. The charge began as a first-degree robbery. This makes sense in the underlying facts. With a pizza robbery, Davis and a group approached their victim, pulled up their masks, and they said, give it up. One member of the group reached into his pocket as if he had a gun. Just over a year later, Davis and a group approached their victim, pulled up masks, said, give it up. This time, Davis reached into his pocket, pulled out a pistol, and killed Johnny Hazel where he stood. A Calhoun County jury could reasonably have found that Davis' first-degree robbery conviction was not, supposing counsel claims, some sort of fun, happy-go-lucky crime. In fact, it was the chilling precursor to the murder that brought us here today. Counsel, here's what doesn't make sense to me. I mean, I agree with you that for the pizza delivery person, it must have been really scary, regardless of the fact that there were no weapons involved. He or she didn't know that. Nevertheless, there's a far cry from just being told that something was a third-degree robbery and hearing that what it was was, you know, five teenagers called up and ordered pizzas and then robbed the guy. Although they pretended he had the weapon, it was not actually Mr. Davis. And then concluding that the next natural step from that is committing first-degree murder. I mean, that's a huge jump, it seems like, and much different than just saying, okay, well, he's previously committed third-degree robbery, and so of course, the next thing he does is he commits a murder. Why wouldn't this have been mitigating evidence? I think that's fair, Your Honor. I think perhaps a juror could have viewed it that way, maybe so. The question for this court is whether any reasonable jurist, any fair-minded jurist, could conclude the conservative Calhoun County jury, at least two of those members would not have been persuaded by this, that they wouldn't have seen it as a prank, but they would have seen it as I just described, as potentially a precursor with very similar actions that eventually mirrored and replicated what this eventually did to Tommy Hazel. And I hear what you're saying, counsel, but again, what role, if any, should the fact that, you know, this was a five to seven jury at some point, right, play in our consideration of prejudice? Your Honor, I'm not exactly sure how to answer that. I think all juries are some mix, and it presumably vacillates throughout the proceeding. Whether they were five, seven at one point, I think any jury could have been down the middle at any given point. What matters is the final verdict that they returned. I mean, I think that, obviously, in the end result, that is what matters. But even though we expect that juries will be split in different ways during the proceeding, we don't expect that juries will come back and ask to pretty much be relieved, or what do we do about this? We can't come to a decision, which, you know, then requires an Allen charge or something of that nature. That is very different when the jury is willing to disclose its division and explain it as having a difficult time coming to a decision than a situation where, you know, there are divisions within the jury that happened during the course of the deliberations, but nobody knows about them. I mean, the jury itself doesn't think itself so divided that it's concerned about reaching a decision. I mean, would you agree? I'm not sure. I don't know that I've considered that type of analytical issue enough to give you a great, awful answer, Your Honor. But I do think that this issue was argued before the state court, but I don't think that the state court was totally unreasonable in rejecting it. Okay, fair enough. Thank you very much, Mr. Wilson. Mr. Masters, we'll hear from you. You've got 10 minutes of rebuttal time. Thank you, Your Honor. We just heard a critical admission by the state. He was asked, asking about abuse is standard competency. Is it not? He said, yes. I'll direct Your Honor to page 199 of our second supplemental appendix, volume one. It's from the rule 32 question of Mr. Giddens. Question, Mr. Giddens, did you ever ask Mr. Davis if he was abused as a child? Answer, I had nothing to base that on. I mean, that's just, there was no reason to ask him that. Question, did you ever ask Mr. Davis' mother if he suffered any kind of abuse of a child, any kind of abuse as a child? Answer, I had no reason to suspect that, end quote. That is game, set, match. We have an admission by the state. You need to ask the question. They didn't ask the question. That is the end of it. Now, we also know from Giddens' testimony exactly what he talked to Jimmy Davis about. It was only guilt and innocence. Giddens testified about that under oath, and he's the only one who met with his client for those first two hours. Adams was not on the case yet. So we know what Giddens talked to Adams about. And he said, the only thing that Adams ever said was, it wasn't me. Go talk to this alibi witness. That's it. Now, counsel also said, we don't know what questions were asked when the interview was done of the mother. We do know. It's in Exhibit 10 in the record from the Rule 32 proceedings. The notes reflect what the questions were. They said, drinking, colon, drugs, colon, school, colon. And that was about it. No questions about abuse. And we have Giddens' admission on the record that he never asked about abuse, and the state's admission that it is standard competency to ask about abuse. Counsel was also asked about sisters being in the timesheets or not. No sisters are anywhere in the timesheets. And pursuant to the state's stipulation, which is not waived, they've been running away from the stipulation for many years now. For example, in 2004, the state first started saying, well, the time entries don't really mean it. And we said, what do you mean? This is sworn testimony of Adams that what's in his time entries is what he did. We never waived that claim. And in terms of whether the younger sisters were interviewed, Exhibit 10 has a note that says, Holiday Inn. Well, that's where the mother worked. So presumably, they interviewed her at the Holiday Inn. And presumably, she didn't have her three young daughters with her, who were not even alive at the time of the abuse, cleaning rooms with her. There's just no support. All of the record evidence is to the contrary. Another error here. The representation was made about, we don't know what Adams did because his either. Page 26. And again, this is a page that we alerted the court and opposing counsel to in our letter on Monday. Question, this is Giddens' testimony. Question, and did you speak with Mr. Adams about whether he had any additional files? Answer, I did. Question, and what did you learn? Answer, he told me he did not have anything additional. Thought that he did, but ultimately, I believe the entire file that he had is what we copied and sent, end quote. And that explains why it's the combined files of Giddens and Adams. Now, there was a discussion about whether there's EDPA deference due. I want to be very clear here. The state court did not address prejudice only on the pizza robbery. We are not claiming that the state did not address prejudice on child abuse. This is at page 569 of the Alabama Court of Criminal Appeals. All they did was say, here's Rompilla. Here are two distinguishing factors from Rompilla, which we know under the Daniel case is unreasonable under this court's precedent to try and distinguish on those two grounds. And then the court concluded, thus, we cannot say the counsel was ineffective for failing to conduct a more detailed investigation into Davis's prior conviction for robbery in the third degree, period, end of section. There is no discussion of prejudice on the pizza robbery anywhere in that decision. Now, a couple of other points that I think are important in terms of the mercy, the strategy of asking for mercy, this court has prohibited from precedent from finding that it was reasonable to rule that Davis's trial counsel could make a strategic decision to ask for mercy because counsel here did not first do an investigation of other potential strategies like childhood abuse. In Rompilla, the counsel only offered pleas for mercy at sentencing when he could have found easily available mitigation evidence. In DeBruce, counsel did the same, even though there was mitigation evidence in a report by a social worker. In both cases, the court concluded counsel was ineffective and the failure to investigate mitigation evidence before deciding on a mercy strategy resulted in prejudice. Moreover, putting on evidence of child abuse would have been in no way inconsistent with asking for mercy. The Rompilla and the DeBruce courts noted that inclusion of readily available mitigation evidence of child abuse would only have strengthened the arguments for mercy at sentencing and that the mitigation evidence would have contextualized the pleas for mercy and made them more convincing to the jurors. Would those pleas have happened if this child abuse evidence had been in? I take the point that his mother didn't attend the Rule 32 hearing that was going to be about her horrific abuse. Is it likely that she would have attended and participated had she known that that abuse was going to come out at the earlier part of the process? Well, first of all, that's a somewhat speculative hypothesis that if these things had happened, she wouldn't have shown up. But let's just presume that she wouldn't have shown up. There are a dozen witnesses who would have testified to the child abuse. At least two of them, if not four, five, or six of them all could have asked for mercy. The sisters, both of the sisters could have asked for mercy. The aunt could have asked for mercy. The grandmother could have asked for mercy. You would have at least half a dozen witnesses here who could all ask for mercy that would be entirely consistent with the strategy. So in Ron Pillow, the Supreme Court said the omitted evidence of child abuse, quote, adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, end quote. That's at page 393. And in DeBruce, this court said, quote, although DeBruce and his mother fled for mercy in his sentencing, it is unlikely that their pleas resonated with the jury in the absence of the omitted mitigating evidence. Counsel was left without an evidentiary basis on which to make an argument for clemency, end quote. That's page 1277 of DeBruce. DeBruce, the DeBruce court also said that trial counsel must gather enough knowledge of the potential mitigation evidence to arrive at an informed judgment in making that decision to pursue a mercy strategy. And under Wiggins, the question is not whether the strategic decision was reasonable. It's whether defense counsel at the time they made that strategic decision had conducted an investigation sufficient to put them in a position to make that strategic decision. So this is at page 527 of the Wiggins decision. The Supreme Court held it was ineffective counsel because the lack of investigation made a fully informed decision with respect to sentencing strategy impossible. And that is Supreme Court precedent binding on this court. Now, there was discussion of the double-edged sword. In some cases, it is possible that if the child abuse evidence was disputed, if it did not actually have any evidence behind it, then you could possibly make an argument that the child abuse evidence would be less credible. That is not this case. We have photographs of Jimmy Davis' back. We have 345 pages of child abuse evidence. I think that what Mr. Wilson was saying wasn't that people would disbelieve the evidence, but rather that Mr. Sigler also suffered comparable or near comparable abuse, and he turned out just fine. So he would suffer by direct comparison. And in that way, it would be a double-edged sword. I don't know if you wanted to address that. Yeah. Well, first of all, Mr. Sigler did not grow up in the same household. He did not have it the same as Jimmy Davis. And let's consider what the jury would have heard about the childhood deprivation and abuse. All that the children were given to eat in Jimmy Davis' family was one half slice of bread and a glass of water a day. They were hungry every day. They snuck out to get food. That's when they were savagely beaten. Jimmy Davis' mother once beat his sister so badly for burning a chicken dinner at the age of eight years old that she broke his arm. And in addition, we have the severe sexual abuse. At the age of two, a doctor said he has bleeding, swollen genitals at the age of two. Andre Sigler didn't have that. And when Jimmy was still an infant, he saw his mother set the curtains on fire and then throw them onto his sleeping father to light him on fire and run out of the house, which is the last time their parents were together. So what would have been the double-edged sword here? That as a small child, he snuck out to get food, or that he wet the bed, or he somehow invited sexual abuse of him as a two-year-old? There is no double-edge here. And what compounds the prejudice is just like in the Farrell case, trial counsel called the abusing parent to testify. The defendant never had any real trouble growing up, and then repeated that in closing argument. This court held that that gave the jury a, quote, profoundly misleading picture of the defendant's moral culpability because the most important mitigating circumstances were completely withheld from it, end quote, at the 1236. The same was true in Johnson v. Secretary. The abusing parent presented a false picture that misleadingly minimized the true mitigating circumstances. Now, there was another falsehood here, and that is that one that his own counsel told the jury following up on that evidence. I'll ask you to wrap it up because your time is almost up, but you can finish this point, please. Thank you. Defense counsel argued Jimmy's mom was a good mother who punished Jimmy and did the best she could, but he just didn't have a father around who could really discipline him the way that he needed. So without even asking Davis or anyone else about discipline before trial, the trial counsel put on a mitigation case that Davis was not disciplined as much as he could have been. It was the opposite of the truth. So therefore, we ask your honors to reverse and revand to order a new sentencing. Thank you, your honors. Thank you, counsel. We will be in recess, and we appreciate both of your arguments. Thank you very much. Hope you have a good rest of your day. Thank you.